UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **Paul and Susan Yellin,** | Civil No. 09-3161 (SRN/JJG) |
| **Plaintiffs,** | |
| v. | <u>MEMORANDUM OPINION AND ORDER</u> |
| **Robertshaw Controls Company, d/b/a Invensys Controls, a Delaware corporation,** | |
| **Defendant.** | |

_____

Joseph F. Lulic, Hanson, Lulic & Krall, LLC, 700 Northstar East, 608 Second Avenue South, Minneapolis, Minnesota 55402, for Plaintiffs

Andrea D. Kiehl & Ashley A. Wenger, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Wells Fargo Center, Suite 3800, 90 South 7th Street, Minneapolis, Minnesota 55402; Hal A. Shillingstad, Flynn, Gaskins & Bennett, LLP, 333 South 7th Street, Suite 2900, Minneapolis, Minnesota 55402, for Defendant

_____

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendant's Motion to Exclude Expert Testimony and for Summary Judgment [Doc. No. 11]. For the reasons set forth herein, Defendant's motion is denied.

**I.    BACKGROUND**

Plaintiffs Paul and Susan Yellin are homeowners of a residence in Mendota Heights, Minnesota. In February 2008, after returning to Minnesota following an eight-day absence, Mr. Yellin discovered water damage to the first floor and lower level of Plaintiffs' home. Plaintiffs allege that the water damage was caused by a defective solenoid valve in their refrigerator-freezer. (See Compl. ¶¶ I-V, Doc. No. 1-1.) Plaintiffs contend that the water damage occurred

due to a crack in the solenoid valve, from which a supply line ran to the kitchen sink, providing water for the refrigerator's ice maker.  In October 2009, Plaintiffs filed suit against the manufacturer of the valve, Defendant Robertshaw Controls Company, d/b/a Invensys Controls, a Delaware Corporation ("Invensys"), in state court.  Defendant removed the action to federal court based on diversity of citizenship.  Invensys denies any liability for Plaintiffs' damages.  (See Answer, Doc. No. 2.)

Invensys moves to exclude the testimony of Plaintiffs' expert, Robert Boesel.  In addition, Invensys moves for summary judgment.  Defendant argues that absent Boesel's testimony, Plaintiffs cannot create a genuine issue of material fact regarding whether the solenoid valve was defective and unreasonably dangerous when it left Invensys's control and whether the solenoid valve break proximately caused the water loss.

## II.   DISCUSSION

### A.   The Daubert Motion to Exclude Expert Testimony

Plaintiffs' expert, Robert Boesel, is a technical investigator who primarily consults with property insurance companies, assisting them in determining the cause of property damage. (Boesel Dep. at 22-28, Ex. D to Affidavit of Andrea D. Kiehl.)  Boesel has had training in mechanical engineering, tool and die design, plastic processes, fire investigation and also has had on-the-job experience in chemical processes and product design.  (Id. at 17-20.)   When a particular product is involved in a property loss, Mr. Boesel performs laboratory testing on the product at issue.  (See id. at 24-25.)

The Yellins seek Boesel's expertise to assist the jury in determining the cause of the water damage to their home.  In his expert report, Mr. Boesel describes his visit to the Yellin's

home shortly after the damage was discovered, during which Boesel examined the Yellin's refrigerator-freezer. Boesel observed that the general area of the leak was on the left front corner of the freezer section, noting, "An inspection of the area showed that a solenoid valve was located there and I noted that the solenoid valve was only there to provide water to the icemaker in the freezer section of the refrigerator-freezer." (Boesel Report at 1-2 [Doc. No. 14-1 at 8-9], Ex. B to Kiehl Aff.) Further, Boesel observed that a paper towel placed under the general area of the solenoid valve was moist, even though Mr. Yellin had closed the shutoff valve for the water supply to the refrigerator-freezer. (Id. at 2 [9].) At his deposition, Boesel testified that when he examined the valve in the refrigerator, he found no evidence of damage to the valve by physical impact because the valve's location underneath the refrigerator, behind the toe kick area and behind a 14-gauge steel mounting bracket made any such impact damage unlikely. (Boesel Dep. at 66-67, Ex. D to Kiehl Aff.) Mr. Boesel then photographed and inspected the solenoid valve, before removing it from the refrigerator. (Boesel Report at 2[9], Ex. B to Kiehl Aff.) He enlarged the photographs, which showed "a complete break age [sic] of the plastic solenoid valve housing immediately behind the galvanized steel mounting bracket. The break was not observable to a human inspector from any angle outside the refrigerator." (Id.)

Boesel later tested the operation of the valve in his laboratory in order to determine if the leak rate could have caused the water damage in the Plaintiffs' home. In his report, he notes the leak rate of the valve at various pressures. (Id. at 4-5 [11-12].) While examining the solenoid valve in the laboratory, Boesel opined that the leak was "the result of a 360° circumferential fracture of the welded-on cover at the inlet end [of the valve]." (Id. at 6 [13].) He further examined the valve with the aid of a stereo microscope. (Boesel Dep. at 40-41, Ex. D to Kiehl

3

Aff.)  During that microscopic examination, he again looked for any sign that damage to the valve could have resulted from physical impact and saw no evidence of either localized impact, such as from a sharp object, or generalized impact from a larger, softer object. (Id. at 67.) Further, Boesel observed no evidence of stress fractures that might have occurred if the valve had frozen or been pressurized to the point of breakage.  (Id.)

Mr. Boesel's report describes the injection molding process by which this valve was manufactured.  There, he notes that the solenoid valve contained a broken cover and that the interior portion of the broken surface was a pale yellow color.  (Boesel Report at 6[13], Ex. B to Kiehl Aff.)  Mr. Boesel explains in his report that the "failure mode" of the injection-molded plastic inlet cover could not be analyzed without disassembling the valve. (Id. at 7 [14].) Because "it would require permanent alteration of the evidence," Boesel did not perform such an analysis.  (Id.)  However, "all evidence points to an internally induced failure of the valve body cover compared to failure induced by external force or impact."  (Id.)

In addition to testing the leak rate in the laboratory, Boesel took the test apparatus back to the Yellin residence and tested the solenoid valve outside the home with water supplied from a hose.  Correcting for a difference in elevation between the test site and the location of the solenoid valve in the kitchen, Boesel determined the leak rate in the kitchen resulted in an actual flow rate of 4,075 gallons of water per day.  (Id.)

In order to rule out other causes of the water damage, Boesel accounted for weather conditions in his report, noting that the minimum temperature during the Yellins' February 2008 absence was -11°F, and that Mr. Yellin stated that he had set the house's thermostat at 68°F during their absence.  (Id. at 8 [15].)  Boesel found that

> the Yellin residence has undoubtedly experienced far colder temperatures in the eight years since the Sub Zero refrigerator-freezer was installed. There is no evidence to support a theory of valve damage by freezing, and the absence of any other leaks anywhere else in the large residence will make it difficult to advance a freeze theory.

(Id.) In his deposition, Boesel offered his opinion on the cause of the water damage, finding "[t]hat the sole source of water was a broken solenoid valve. There was no other water leak anywhere else in the residence. That the cause of the water loss was a break in the Invensys solenoid valve, and that all appearances at this time are that the break in the solenoid valve resulted from a material defect in the plastic used to mold the solenoid valve." (Boesel Dep. at 30, Ex. D to Kiehl Aff.)

Invensys claims that Boesel is not qualified to offer an expert opinion in this matter, because he is not a licensed professional engineer and has no education or training specific to plastics, spin welding or solenoid valves. Moreover, Defendant argues that Boesel performed no testing to verify his theory of a defect in the solenoid valve.

Opinion testimony from an expert "qualified . . . by knowledge, skill, experience, training or education" is admissible "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact" and if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. The Court, acting as a "gatekeeper," must evaluate whether proffered expert testimony passes muster under Rule 702, Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597-98 (1993), bearing in mind that the touchstone for admitting such testimony is assistance to the trier of fact. See, e.g., Larson v. Kempker, 414 F.3d 936, 941 (8th Cir.2005). Courts may allow expert testimony only

when it is both relevant and reliable, Daubert, 509 U.S. at 597-98, but "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony," and "favors admissibility over exclusion." Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001). Accordingly, doubts regarding the usefulness of an expert's testimony should be resolved in favor of admissibility, United States v. Finch, 630 F.3d 1057, 1062 (8th Cir. 2011), and "[g]aps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." Robinson v. GEICO Gen. Ins. Co., 447 F.3d 1096, 1100 (citing 29 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure: Evidence § 6265 (1997)). "The exclusion of an expert's opinion is proper only if it is so fundamentally unsupported that it can offer no assistance to the jury," Wood v. Minn. Mining & Mfg. Co., 112 F.3d 306, 309 (8th Cir.1997) (internal quotations and citation omitted),.

> In screening expert testimony under Rule 702, a district court applies a three-part test.
>
> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

Lauzon, 270 F.3d at 686 (internal citations and quotations omitted).

Applying this test to Mr. Boesel's proffered expert opinion, the Court finds it sufficiently reliable to be admitted under Rule 702 and Daubert. Courts analyze reliability from a flexible, case-specific standpoint. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149-150 (1999). Factors to be considered are whether the theory or technique can be or has been tested, whether it has been or is subject to peer review, and whether the theory or technique is generally accepted

within the relevant scientific community. Id. While Defendant argues that Mr. Boesel's conclusions have not been tested and have not been subject to peer review or publication, Plaintiffs argues that Boesel's methods are generally accepted, and while his conclusion was not subject to peer review or publication, his conclusions have been tested.

Given the particular, limited facts here – water damage to a single home stemming from a single refrigerator-freezer – it is not surprising that Mr. Boesel's conclusions have not been subject to peer review or publication. Mr. Boesel has, however, testified in other property damages cases in which his investigative abilities have been utilized, and to this Court's knowledge, Mr. Boesel's opinions have not been excluded under a Daubert standard in other cases. The fact that his opinion in this case has not been subject to peer review or publication is not fatal to his proffered testimony, particularly as publication and peer review is but one factor that courts consider in the admissibility of expert testimony.

While Defendant argues that Boesel has not performed testing and that his findings are merely "preliminary," his conclusions are supported by visual observation and testing. He tested the leak rate in the lab and also on-site. Invensys also argues that, in reaching his conclusions, Boesel failed to review manufacturer drawings of the solenoid valve as well as blueprints or schematics of the Yellin residence to determine the location of the water supply line. Mr. Boesel examined the valve on-site both with the naked eye and with the aid of enlarged photographs, then he removed it and further examined it under a stereo microscope in his laboratory. He observed a break, or fracture, in the welded-on cover at the inlet end. He tested the leak rate of the valve at various pressures both in the lab, and, using the test apparatus, at the Yellin residence under on-site conditions. (See Boesel Report at 5[12].) Based on his visual observations of the

valve, both unaided and with a microscope, he saw no evidence that the break was caused by physical impact or by freezing. (Boesel Dep. at 67.) As for why Boesel did not test the actual leak rate of the solenoid valve as installed, he sufficiently explained that there was no practical way in which to do so. (Id. at 39-40.)

From the description of his testing methodology, the Court is satisfied that, for purposes of the Daubert standard, Boesel performed his examination using a generally-accepted methodology. As he explained in his deposition, when he performs causal investigations, Boesel first tests under "real world conditions," and then, he tests using instruments with a known accuracy level. (Id. at 51.) In this case, Boesel's testing goal was to determine whether or not the break of the valve could be consistent with the level of damage observed in the Yellins' residence. (Id. at 52.) Boesel tested the valve on-site and in his laboratory. While Invensys disagrees with Boesel's conclusions, defense counsel may challenge those conclusions through rigorous cross-examination. The Court is satisfied that Mr. Boesel is qualified to offer his opinion and that his proffered testimony sufficiently satisfies the reliability requirements of Daubert.

As to the relevance of Mr. Boesel's proffered testimony, the Court finds that his proffered opinion is relevant. Defendant offers little substantive argument to the contrary, other than its arguments against Boesel's testing and methodology. Opinion evidence as to the cause of the water damage to the Yellins' home addresses the central issue in this case. Such testimony is therefore relevant and will assist the trier of fact.

    **B.**    **Defendant's Summary Judgment Motion**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996). Because Defendant's summary judgment motion was premised upon the exclusion of Plaintiff's expert testimony, which this Court has denied, Defendant's summary judgment motion is therefore denied. Invensys has not demonstrated that there is no genuine issue of material fact and is accordingly not entitled to judgment as a matter of law.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

Defendant's Motion to Exclude Expert Testimony and for Summary Judgment [Doc. No. 11] is **DENIED.**

Dated: May 17, 2011

                                                   s/Susan Richard Nelson

                                                   SUSAN RICHARD NELSON
                                                 United States Magistrate Judge